686 S.E.2d 64

Carol A. HELFER, Petitioner
Below, Appellant

v.

Robert J. HELFER, Respondent
Below, Appellee.

No. 34703.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 9, 2009.

Decided Nov. 2, 2009.

Kevin M. Pearl, William R. Keifer, Frankovitch, Anetakis, Colantonio & Simon, for the Appellant.

Mark D. Panepinto, Panepinto Law Offices, Wheeling, for Appellee.

PER CURIAM:

This is the second appeal by Appellant Carol A. Helfer ("Appellant wife" or "Appellant") concerning the valuation of the chiropractic practice of her former spouse, Appellee Robert J. Helfer ("Appellee husband" or "Appellee"), for purposes of equitable distribution in the parties' divorce. In a previous appeal, this Court concluded that the family court committed reversible error insofar as it failed to take into account the intangible asset of enterprise goodwill when it adopted the valuation calculation offered by Appellee husband's accounting expert. *Helfer v. Helfer*, 221 W.Va. 625, 656 S.E.2d 70 (2007) ("*Helfer I*"). Accordingly, we ordered, *inter alia*, that, "[o]n remand ... the valuation of Appellee's business should include a reasonable approximation of the business' enterprise goodwill, if any, based upon competent evidence and on a sound valuation method. If the lower court finds there to be no enterprise goodwill, it is essential that the court not only articulate that finding, but also explain its reasons for making such finding." 221 W.Va. at 628, 656 S.E.2d at 73.

The issue in the present appeal is whether, following remand, the family court properly attributed an enterprise goodwill value of zero to Appellee's chiropractic business.

Having carefully considered the briefs, record and arguments of counsel, this Court affirms the order of the circuit court.

## I. Factual and Procedural Background

This divorce proceeding began in 2002 when Appellee husband filed for divorce from Appellant wife after almost twenty years of marriage. As in *Helfer I*, the singular issue in the present appeal involves the valuation of Appellee's chiropractic business for purposes of equitable distribution. The precise issue herein concerns the value, if any, of the enterprise goodwill as it relates to the business, a sole proprietorship.[1]

During an evidentiary hearing conducted on April 1, 2005, in the Family Court of Ohio County, the parties' accounting experts testified in connection with their respective written reports on the valuation, or fair market value, of Appellee's chiropractic practice. Appellee's accounting expert, Louis J. Costanzo, III, used the straight capitalization of earnings method to value the business at $41,000.00.[2] It is undisputed that Mr. Costanzo's valuation calculation of the business did not specifically address enterprise goodwill.

Appellant's accounting expert, Jack R. Felton, CPA, calculated the value of Appellee's business at $388,000.00, using the capitalization of excess earnings approach.[3] During

---

1. Because the issue in *Helfer I* involved only whether the family court was required to take into account the value, if any, of enterprise goodwill, it was not necessary in that case that we set forth the substance of either the valuation reports prepared by the parties' respective accounting experts or the experts' testimony elicited at the April 1, 2005, hearing. In the instant appeal, however, the experts' reports and testimony are crucial to our determination that the family court committed no error in concluding that Appellee's chiropractic business has an enterprise goodwill value of zero. Accordingly, this opinion sets forth, in some detail, those portions of the experts' testimony and reports which are relevant to our holding in this appeal.

2. In his written report, Mr. Costanzo explained that the capitalization of earnings method is "used when a company's future operations are not expected to change significantly from its current normalized operations or where future operations are expected to grow at a somewhat predictable rate." He reported that he selected "adjusted net income as the earnings stream to be capitalized." Mr. Costanzo used "historical earnings over the last five years (1997–2001). Since the date of valuation is October of 2002, the most recent completed five-year period (1997 through 2001)" was used in his valuation. He further reported that "[i]n normalizing the income stream, non-recurring and discretionary expenses were adjusted. To these amounts, adjustments were made to eliminate extraordinary or nonrecurring items and discretionary expenses, to obtain the reasonable sustainable operating profit that a buyer could expect to receive from the [Appellee's] Practice." Furthermore, "[t]he estimated future earnings of the [Appellee's] Practice [were] capitalized by an appropriate capitalization rate to arrive at the fair market value of the Practice." Valuation Report of the Fair Market Value of the Chiropractic Practice of Robert J. Helfer, D.C. (A Sole Proprietorship), prepared by Louis J. Costanzo, III, CPA, MBA.

According to Mr. Costanzo's report, he arrived at a total normalized income for the years 1997 through 2001, and then estimated future earnings by averaging the earnings over that same time period. He "weighted the most recent years heavier than prior years by using a multiplier for each of the five years[,]" in order to obtain a "weighted average pre-tax earnings before reasonable compensation." Mr. Costanzo "then deducted reasonable compensation … and deducted a provision for federal and state income taxes, which resulted in a weighted average after-tax earnings of $10,664." Finally he capitalized the normalized earnings stream. "In arriving at an appropriate capitalization rate, [he] used the build-up approach, which …. is based on the premise that a company's discount rate (and, consequently, its related capitalization rate) is composed of a number of identifiable risk factors which result in a total return that a prudent investor would demand from the purchase of the Practice. Using this approach, [Mr. Costanzo] arrived at a net earnings capitalization rate of 26 percent…. Applying this rate to the weighted average earnings yields a value of $41,000 (rounded)."

3. In his report, Mr. Felton indicated that under the capitalization of excess earnings method, "[a] rate of return is determined first on the company's tangible assets. The excess earnings is then calculated by determining the difference between the company's net earnings and a fair return on its tangible assets. To compute the value of the intangible, the excess earnings are capitalized using a cap rate suitable for intangibles. To determine the value of the company, the value of [the] company's intangible assets is added to the company's net tangible assets." In his report,

the April 1, 2005, hearing, Mr. Felton opined that there is some enterprise goodwill associated with Appellee's business. According to Mr. Felton, "[e]nterprise goodwill considers things such as location, facilities, convenience, advertising, telephone numbers, patient lists and other data base materials." Mr. Felton was of the opinion that Appellee's business has a "great location" that is in a "high traffic area" where there has been "a lot of development." However, Mr. Felton acknowledged that Appellee's business was experiencing a "downward trend" in terms of number of patients seen per day and yearly revenue.[4] Mr. Felton noted that, according to his research, the use of chiropractic services is generally increasing in this country; however, Appellee's practice is "trending downwards." Finally, Mr. Felton testified:

> The last part that I'll say about the goodwill section is I guess you'd have to think in terms of, you know, what if [Appellee husband] didn't show up tomorrow, what would be the goodwill in his practice at that point, and that would be a good question to ask. And I think that at this point in time you would say hypothetically if the practice was left there on its own could [Appellant wife] take the practice over, hire a chiropractor—this is all hypothetical—and basically pay that person a fee and collect the balance of the money that was available and earn what would be the goodwill at that point."

Although Mr. Felton opined that there was enterprise goodwill associated with Appellee's business, it is undisputed that he failed to assign a value to it.

Following the testimony of Mr. Felton, Appellee husband presented a rebuttal witness, accountant John S. Bodkin, Jr., the managing partner of a local certified public accounting firm. Mr. Bodkin testified that, upon reviewing the valuation reports of both Mr. Costanzo and Mr. Felton, he ascertained their similarities and differences and, in his professional judgment, indicated what he "thought were reasonable assumptions and reasonable approaches." First, Mr. Bodkin testified that the valuation method used by Mr. Felton, the capitalization of excess earnings method (a cost approach) was not an appropriate method in this case, particularly because the business is a sole proprietorship. Mr. Bodkin stated:

> Mr. Costanzo [Appellee husband's expert] made an assumption that the cash and the accounts receivable which ultimately had been liquidated into cash would be distributed as cash and not as assets of the practice itself[5].

> I think that this fact that this is a sole proprietorship and as the assets, cash, and ultimately the accounts receivable were divided as marital assets and not assets of the practice, the selection of the excess earnings method by Mr. Felton are inappropriate. There would basically be no assets at this point to substantially impact the value of the practice.

According to Mr. Bodkin,

> The excess earnings method is a method of valuing businesses that was devised by the Internal Revenue Service back in 1968, and the IRS recommends it be used, but only if there's no better method available. That's what it says in ruling 68–679, only if there's no better basis available. The conceptual basis for the [excess] earnings method computes the company's equity based on the appraised value of tangible assets.

> So Mr. Felton says that the majority of assets are intangibles in this method. But

---

Mr. Felton opined that the "excess earnings method is used frequently in valuations of professional practices. This method was designed to measure intangible assets. The majority of assets in professional practices are intangibles therefore, the use of this method is the most appropriate." Valuation of the Chiropractic Practice of Robert J. Helfer D.C., prepared by Felton & Felton, A.C. CPAs.

4. According to the tax returns of Appellee's business (used by both parties' accounting experts in

their respective valuation reports), the net revenue of Appellee's business for 1997 was $358,031; for 1998, $333,262; for 1999, $250,000; for 2000, $255,757; and for 2001, $224,908.

5. This is because, as Mr. Bodkin explained, the subject business "is a sole proprietorship, not a corporation. A sole proprietorship is owned by the owner. The assets are owned by the owner. The cash in a sole proprietorship is owned by the owner."

also to that you would add the tangible assets, but only if you have appraised values available.

Mr. Bodkin was critical of the fact that Mr. Felton did not use appraised values for the business' tangible assets, but instead, used assumed values:

If we're trying to figure out what the value of those assets is, we have to know what the appraised value is, and I think that the literature on how to use the excess earnings method clearly states that you need to have an appraised value.... I thought it was interesting, Mr. Felton said that his value of $53,000 for the assets was determined based on his understanding from [Appellant wife] of the condition of the assets.[6]

(Footnote added)

Mr. Bodkin emphasized that "without an appraisal this method [capitalization of excess earnings method] shouldn't be used." On the other hand, Mr. Bodkin opined that Mr. Costanzo followed IRS guidelines in calculating the depreciated values of the business' tangible assets.[7]

Another difference in the two experts' valuation reports addressed by Mr. Bodkin involved reasonable compensation. Mr. Costanzo, Appellee husband's expert, reported that the business does not deduct as an expense compensation to Appellee because the business is a sole proprietorship. Thus, Appellee is taxed on all of the business' earnings, whether or not he takes a distribution. According to Mr. Costanzo's report, "the basis of normalizing compensation lies in the market value of the service (performed), not necessarily in the money distributed. In other words, what would a hypothetical willing buyer have to pay someone to perform the same services provided by [Appellee]." Based upon his analysis, Mr. Costanzo opined that a total compensation amount of $110,000 would be reasonable.[8]

In contrast, Mr. Felton, Appellant wife's expert, reported that he "did not use the usual comparative compensation information found on salary.com" because Appellee's business was only open 30 hours per week.[9] Rather, according to Mr. Felton, "the financial studies of small business has determined the average owner salary of a chiropractic practice to be 23% of total revenues. We used this percentage (23%) and multiplied by total practice revenues. This amount was subtracted." Thus, in calculating the value of the business, Mr. Felton testified that he used not the actual income of Appellee, as set forth on his tax returns, but a hypothetical number having "nothing to do with [Appellee's] income" for purposes of determining excess earnings.[10]

**6.** Mr. Felton testified that he interviewed Appellant wife regarding the quality of the equipment because she worked in the office of the chiropractic business. Mr. Felton stated that he never personally saw the tangible assets to which he was assigning a value, but that, according to Appellant wife, they were in "good repair, good condition, obviously being used every day in part of the practice."

**7.** With regard to the equipment, furniture and fixtures of the business, Mr. Costanzo, Appellee husband's expert, noted that "most of them are in excess of 15 years old." He opined that "[t]hey have very little value." Mr. Costanzo indicated that, in preparing his valuation report, "[w]e in effect have ignored that, ignore[d] those items in this valuation to a great extent because they do not have much of a value." He further indicated that, after his report was completed, the furniture and fixtures were professionally assessed for $1,228, and the equipment, for approximately $5,645.

**8.** According to Mr. Costanzo, the figure $110,000 was deemed reasonable based upon knowledge of salaries in the local area. Mr. Costanzo also consulted www.salary.com to determine that the average salary for a typical chiropractor in the area is $102,182. Considering Appellee has more than 15 years of experience, Mr. Costanzo opined that compensation in the amount of $110,000 would be required to get someone to perform the same services as Appellee.

**9.** It is unclear how Mr. Felton determined that the business was opened only 30 hours per week. The basis for this assumption does not appear to be in the record.

**10.** Mr. Felton testified that "[t]he hypothetical number represents what you would pay an individual to come in and run the practice." The average reasonable compensation over the five-year period, as calculated under the capitalization of excess earnings method used by Mr. Felton, was approximately $65,000. Hypothetically, if Appellant wife were to take over the practice, she would receive the remaining income from the practice after paying a chiropractor a salary. Obviously, the lower the salary she were to pay a

As Mr. Bodkin explained, the impact of using a lower compensation value, as Mr. Felton did, is that it increases the earnings of the business; conversely, using a higher compensation value, as Mr. Costanzo did, decreases the earnings of the business.

Another difference between the reports of the parties' accounting experts was the amount of rental income for the use of the 2,200 square foot building where the chiropractic business is located.[11] Mr. Costanzo determined fair market rental value to be $18 per square foot. Mr. Felton, on the other hand, used $10 per square foot. Upon review of the two rental values, Mr. Bodkin stated:

> The lower the rent the higher the earnings being capitalized, so the lower the rent the greater the value. I thought it was interesting that Mr. Felton in his discussion of enterprise goodwill talked about how valuable a location was and that people—I personally, I think I would go to a doctor whether he was on that side of Chicken Neck Hill or he was downtown. I go to a doctor because of the doctor, not because of location. But when Mr. Felton talked about enterprise goodwill he talked about how valuable the location was. I was surprised to hear him say it was only worth $10 a square foot.[12]

As described above, Mr. Bodkin opined that the straight capitalization of earnings approach as used by Appellee's expert, Mr. Costanzo, was the appropriate method to value this chiropractic business. When asked by Appellant wife's counsel whether the "multiple of gross" method of valuation would also have been an appropriate method[13], Mr. Bodkin replied,

> And that could be one method that could be used, just like a CPA would. And I would say that in looking at my CPA practice and in discussing with my partners just when we're not doing anything else—not that we're selling our practice, what would we sell it for or what would we buy someone else's practice for? There's a CPA firm in town that might have declining revenues,[14] and what would we pay for theirs.
>
> It used to be in our town that you could get one times revenue, that you could get maybe 1.1 and 1.2 times revenue. Never a 1.5, okay? But you can't get that any more. And the way that that method is used in our community, if it's used at all, because there aren't that many practices that are trading, but a way that that method is used is, okay, that's a goal and I'll pay you based on retention. *Because there is no enterprise goodwill.*

(Emphasis added)

Additionally, with regard to whether the fair market value of Appellee's chiropractic business has any value for enterprise goodwill, Mr. Bodkin was asked by Appellant wife's counsel, "You don't give any value to

---

chiropractor, the higher the amount of income to her.

**11.** The building out of which the business operates is owned by Appellee but was not to be part of the valuation of the business; rather, it was to be valued separately. Mr. Costanzo testified that, because the building was to be separately valued, "it became important to deduct—to remove from the Schedule C the depreciation regarding the building and also the interest cost that was being used to pay for the building. So as a result ... we removed both and you add back the depreciation and add back the interest expense to affect those normalizing adjustments." Mr. Costanzo explained that the values for the depreciation and the interest expense came directly from Appellee's Schedule C because "if we are removing the building and the land, we've removed the depreciation and the interest, but since he's still operating there we

must reflect some costs. So basically I estimated what I interpret to be a fair market value of a rental for the use of that building."

**12.** Mr. Bodkin testified that he has experience in ascertaining fair market rental values in the local area as he has an ownership interest in an office building located near Appellee's business. According to Mr. Bodkin, "we don't have any space rented to anyone who's not an owner for less than $16 a square foot."

**13.** Neither accounting expert in this case used the multiple of gross method.

**14.** It is undisputed that Appellee's chiropractic business experienced declining revenues for the five-year period 1997–2001 (the period used in both experts' valuation calculations). See n. 4, *supra.*

enterprise goodwill; is that correct?" Mr. Bodkin replied, "I really don't." [15]

In a Final Order Regarding Equitable Distribution, entered May 3, 2005, the family court concluded that the value of the business was $41,000, in accordance with the valuation calculation of Appellee husband's expert, Mr. Costanzo. On June 2, 2006, Appellant wife filed a petition for appeal from the family court's order to the Circuit Court of Ohio County. In an Amended Order entered August 21, 2006, that court refused Appellant's petition. Appellant filed a petition for appeal to this Court, which we granted on the issue of whether it was error for the family court to adopt the valuation of Appellee's expert because it did not include the intangible asset of enterprise goodwill.[16] In *Helfer I*, we relied on our prior opinion of *May v. May*, 214 W.Va. 394, 589 S.E.2d 536 (2003), and ordered that the family court's order be reversed "insofar as the adopted valuation failed to take into account enterprise goodwill as it relates to Appellee's chiropractic practice." 221 W.Va. at 628, 656 S.E.2d at 73. We further ordered that, "[o]n remand, and consistent with our decision in *May*, the valuation of Appellee's business should include a reasonable approximation of the business' enterprise goodwill, if any, based upon competent evidence and on a sound valuation method. If the lower court finds there to be no enterprise goodwill, it is essential that the court not only articulate that finding, but also explain its reasons for making such finding." 221 W.Va. at 628–29,

656 S.E.2d at 73–74 (citing *May*, 214 W.Va. at 407, 589 S.E.2d at 549).

On November 20, 2007, following our decision in *Helfer I*, the circuit court entered an Order on Remand. On February 19, 2008, Appellee husband filed Petitioner's Motion/Request to Clarify Final Order Regarding Equitable Distribution Entered May 3, 2006, Based Upon Existing Competent Evidence Existing in the Record of these Proceedings. Also on that date, Appellant wife filed a response to Appellee's motion, opposing the request that the matter be decided upon the existing record and requesting, instead, that the issue of the value of enterprise goodwill as it relates to Appellee's chiropractic business be set for trial.[17]

On March 31, 2008, the family court entered Order Upon Remand Supplementing and Clarifying the Final Order Regarding Equitable Distribution Entered on the 3rd Day of May, 2006. In that order, the family court indicated that, notwithstanding this Court's admonition in *Helfer I*, it, in fact, "recognize[d] the concept of enterprise goodwill, considered the same, and gave no value to it." The court acknowledged, however, that it "failed to specifically express a zero dollar ($0.00) value and explain the reasons for attributing no value to the enterprise goodwill of the chiropractic business." Furthermore, the court acknowledged the transcription error involving the testimony of Appellee's rebuttal witness, Mr. Bodkin, regarding whether he gave any value to enterprise goodwill in this case. As previously in-

15. In the first appeal, the transcript submitted to this Court indicated that Mr. Bodkin's answer to this question of whether he gave any value to enterprise goodwill was "I broke it down." Following our decision in *Helfer I*, however, Appellee husband filed with the family court Petitioner's Motion/Request to Clarify Final Order Regarding Equitable Distribution Entered May 3, 2006, Based Upon Existing Competent Evidence Existing in the Record of these Proceedings, in which he averred that "I broke it down" was not an accurate transcription of Mr. Bodkin's true response to the question posed. Rather, Appellee argued that, as demonstrated by the audio/video recording of Mr. Bodkin's testimony, it is clear that Mr. Bodkin's precise answer was "I really don't." Appellee also submitted an affidavit by Mr. Bodkin, which likewise indicated his true answer. The error was ultimately corrected without objection by Appel-

lant wife. As discussed below, the family court relied on the corrected answer in its conclusion that there is no value for enterprise goodwill as it relates to Appellee's business.

16. Appellant raised several assignments of error in her petitions for appeal to both the circuit court and this Court. Her petition for appeal to this Court was granted only as to the assignment of error related to enterprise goodwill.

17. On February 21, 2008, Appellant wife filed Respondent's Supplemental Disclosure of Expert Witness's Valuation Report. Attached thereto was a valuation report of Appellee's business prepared by another accounting expert, which included, *inter alia*, an enterprise goodwill value of $102,270.

dicated, Mr. Bodkin responded "I really don't." However, the original transcript erroneously noted his response as "I broke it down." See n. 15, supra. In its March 31, 2008, order, the family court relied on this testimony by Mr. Bodkin, as corrected in the transcript, and concluded that Appellee husband's business has an enterprise goodwill value of zero. The court also relied on Mr. Bodkin's testimony in which he "rejected any concept of a multiplier theory 'because there is no enterprise goodwill.' "

Finally, the family court determined that it would not allow the parties to submit additional evidence on the enterprise goodwill issue:

> In determining the issue of enterprise goodwill, this Court is constrained (fortunately or unfortunately) by the record the parties make or fail to make .... this Court can make its decision solely upon the record before it. In the case at bar, the only evidence presented indicated that the petitioner's chiropractic business had a zero value related to enterprise goodwill.

Accordingly, the family court concluded that "[t]here exists no enterprise goodwill attributable to the petitioner's chiropractic business which is a distributable asset for equitable distribution purposes. The value of the enterprise goodwill of the petitioner's chiropractic business is zero dollars ($0.00)." Thereafter, by order entered June 26, 2008, the circuit court refused Appellant wife's petition for appeal from the family court's March 31, 2008, order. It is from this order that Appellant now appeals.

## II.  Standard of Review

Our standard of review of the circuit court's order is governed by the Syllabus of *Carr v. Hancock*, 216 W.Va. 474, 607 S.E.2d 803 (2004):

> In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*.

## III.  Discussion

Appellant wife's argument that the family court erred in concluding Appellee's chiropractic business has an enterprise goodwill value of zero is essentially two-fold: First, Appellant argues that in relying on the testimony of Appellee's rebuttal witness, John Bodkin, the family court failed to use a sound valuation method to determine the enterprise goodwill value of Appellee's chiropractic business. Second, Appellant contends that *Helfer I* required the family court to conduct an additional evidentiary hearing on the enterprise goodwill issue and that it was error for the court to refuse to do so. We are not persuaded by Appellant's arguments and, as discussed below, conclude that the family court committed no error in finding that Appellee's business has an enterprise goodwill value of zero.

## A.

This Court recognized, in *Helfer I*, that "enterprise goodwill" is an asset subject to equitable distribution in a divorce:

> " ' "Enterprise goodwill" is an asset of the business and may be attributed to a business by virtue of its existing arrangements with suppliers, customers or others, and its anticipated future customer base due to factors attributable to the business.' " Syl. Pt. 2, *May v. May*, 214 W.Va. 394, 589 S.E.2d 536 (2003).

> " 'In determining whether goodwill should be valued for purposes of equitable distribution, courts must look to the precise nature of that goodwill.... [E]nterprise goodwill, which is wholly attributable to the business itself, is subject to equitable distribution.' " Syl. Pt. 4, in pertinent part, *May v. May*, 214 W.Va. 394, 589 S.E.2d 536 (2003).

Syl. Pts. 2 and 3, 221 W.Va. at 628, 656 S.E.2d at 71.

As previously indicated, in *Helfer I*, the family court adopted the valuation of Appellee husband's accounting expert, which did not include any value (zero or otherwise) for enterprise goodwill. Accordingly, we reversed the family court's decision insofar as

it failed to take into account enterprise goodwill, and remanded the matter with instructions that "the valuation of Appellee's business should include a reasonable approximation of the business' enterprise goodwill, if any, based upon competent evidence and on a sound valuation method." 221 W.Va. at 628, 656 S.E.2d at 73. We further instructed that should the lower court find "there to be no enterprise goodwill, it is essential that the court not only articulate that finding, but also explain its reasons for making such finding." 221 W.Va. at 628–29 656 S.E.2d at 73–74. It is Appellant wife's contention that rebuttal witness John Bodkin did not provide a sound valuation method upon which he based his opinion that Appellee's business has no enterprise goodwill and that, as a result, it was error for the family court to rely on his opinion in assigning a zero value to the enterprise goodwill of the business.[18]

Mr. Bodkin, a certified public accountant, testified that he reviewed the written valuation reports of both parties' experts and explained, in his professional judgment, why the straight capitalization of earnings method, as used by Appellee husband's expert, was the appropriate valuation method to be used in this case. Moreover, Mr. Bodkin also explained, in great detail, why the valuation method used by Appellant wife's expert—the capitalization of excess earnings method—was *not* appropriate.[19]

In his report, Mr. Felton stated that, under the capitalization of excess earnings method, "[a] rate of return is determined first on the company's tangible assets. The excess earnings is then calculated by determining the difference between the company's net earnings and a fair return on its tangible assets. To compute the value of the intangible, the excess earnings are capitalized using a cap rate suitable for intangibles." See n. 3 *supra.* Mr. Felton's report made clear that the value of the company is determined by adding its intangible assets to its net tangible assets. However, as indicated above, Mr. Felton, Appellant's expert, failed to use appraised values for the business' furniture, fixtures and equipment, but instead used assumed values based upon Appellant wife's description of them as being in "good repair" or "good condition." According to Mr. Bodkin, without appraised values, Mr. Felton simply should not have valued the business using the capitalization of excess earnings method.

Mr. Bodkin also noted the differences in the experts' respective calculations of reasonable compensation and fair market rental value of the building where the business is located. With regard to the latter, Mr. Bodkin questioned the fact that Mr. Felton testified that the business was located in a desirable location, yet valued the property at $10 per square foot, a value substantially less than the going rate.

Importantly, Mr. Bodkin testified that because the business is a sole proprietorship and the "assets, cash, and ultimately the accounts receivable were divided as marital assets and not assets of the practice, the

---

18. Appellant also argues that Mr. Bodkin's testimony was inadmissible as expert testimony under West Virginia Rule of Evidence 702 and should not have been considered by the family court in the first instance. However, Appellant wife did not object to Mr. Bodkin's testimony at the time it was given (nor did she raise the issue of its admissibility before the circuit court in her petition for appeal). It is well settled that "'"[t]his Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance." Syllabus Point 2, *Sands v. Security Trust Co.,* 143 W.Va. 522, 102 S.E.2d 733 (1958).' Syllabus Point 2, *Duquesne Light Co. v. State Tax Dept.* 174 W.Va. 506, 327 S.E.2d 683 (1984), *cert. denied,* 471 U.S. 1029, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985)." Syllabus Point 8, *Charlton v. Charlton,* 186 W.Va. 670, 413 S.E.2d 911 (1991). Therefore, we will not consider this argument regarding the admissibility of Mr. Bodkin's testimony because it was not properly preserved below.

19. In *May,* we recognized that there are "'a variety of acceptable methods of valuing the goodwill of a professional practice, and no single method is to be preferred as a matter of law.'" 214 W.Va. at 405–06, 589 S.E.2d at 547–48 *(quoting McDiarmid v. McDiarmid,* 649 A.2d 810, 815 (D.C.App.1994)). *See Helfer I,* 221 W.Va. at 628 n. 4, 656 S.E.2d at 73 n. 4. Thus, in *May,* this Court recognized five major (and acceptable) valuation formulas: the straight capitalization method; the capitalization of excess earnings method; the IRS variation of capitalized excess earnings method; the market value approach; and the buy/sell agreement method. 214 W.Va. at 406, 589 S.E.2d at 548.

selection of the excess earnings method by Mr. Felton are [sic] inappropriate. *There would basically be no assets at this point to substantially impact the value of the practice."* (Emphasis added) Indeed, on this point, Appellee's expert, Mr. Costanzo, concurred, testifying that the capitalization of excess earnings method "is not appropriate for an evaluation of [Appellee's] practice because there are not any excess earnings to be valued."

Ultimately, during cross examination by Appellant's counsel, Mr. Bodkin testified that he did not give any value to enterprise goodwill as it relates to Appellee's business. He further explained, when questioned by Appellant's counsel, that a multiple of gross method of valuation would not be appropriate in valuing a business with declining revenues because "there is no enterprise goodwill."

In syllabus point one of *Bettinger v. Bettinger*, 183 W.Va. 528, 396 S.E.2d 709 (1990), this Court held:

A measure of discretion is accorded to a family law master in making value determinations after hearing expert testimony. However, the family law master is not free to reject competent expert testimony which has not been rebutted. This statement is analogous to the rule that " '[w]hen the finding of a trial court in a case tried by it in lieu of a jury is against the preponderance of the evidence, is not supported by the evidence, or is plainly wrong, such finding will be reversed and set aside by this Court upon appellate review.' " Syllabus Point 1, in part, *George v. Godby*, 174 W.Va. 313, 325 S.E.2d 102 (1984), *quoting* Syllabus Point 4, *Smith v. Godby*, 154 W.Va. 190, 174 S.E.2d 165 (1970).

*See* Syl. Pt. 5, *Kimble v. Kimble*, 186 W.Va. 147, 411 S.E.2d 472 (1991); Syl. Pt. 2, *McGraw v. McGraw*, 186 W.Va. 113, 411 S.E.2d 256 (1991).

In the case *sub judice*, we find that the family court did not abuse its discretion in finding there to be no enterprise goodwill associated with Appellee's chiropractic business. Though Appellant contends that Mr. Bodkin's testimony was not based upon a sound valuation method and competent evidence, as required by *Helfer I*, this Court disagrees. Mr. Bodkin reviewed both experts' written reports and his testimony revealed that he was clearly knowledgeable with regard to their valuation calculations. He explained, in detail, why he found the valuation calculation of Appellant wife's expert to be seriously flawed and why he concurred with the valuation formulated by Appellee husband's expert. Both Mr. Bodkin and Mr. Costanzo agreed that the business has no excess earnings, which supported Mr. Bodkin's conclusion that there is no enterprise goodwill to be valued. *See May*, 214 W.Va. at 406 n. 18, 589 S.E.2d at 548 n. 18 (recognizing that " '[g]oodwill is excess earning power: once the normal rate of return for identifiable tangible and intangible assets is determined, any rate of return in excess of a normal return is attributable to unidentifiable intangible assets—goodwill.)' " (*quoting* Alicia Brokars Kelly, "Sharing a Piece of the Future Post–Divorce: Toward a More Equitable Distribution of Professional Goodwill," 51 Rutgers L.Rev. 569, 610 (1999)). It was not an abuse of discretion for the family court to find Mr. Bodkin's opinion in this regard to be both credible and reliable and, accordingly, to conclude that Appellee's business has an enterprise goodwill value of zero.

### B.

Next, Appellant wife argues that our decision in *Helfer I* required the family court to conduct an additional evidentiary hearing on the enterprise goodwill issue and that the court committed error in failing to do so. It is her contention that the following language in *Helfer I* mandated that additional evidence be taken: "On remand ... the valuation of Appellee's business should include a reasonable approximation of the business' enterprise goodwill, if any, based upon competent evidence and on a sound valuation method." 221 W.Va. at 628, 656 S.E.2d at 73 (internal citations omitted).

In syllabus point 3 of *State ex rel. Frazier & Oxley v. Cummings*, 214 W.Va. 802, 591 S.E.2d 728 (2003), we made clear that

Upon remand of a case for further proceedings after a decision by this Court, the

circuit court must proceed in accordance with the mandate and the law of the case as established on appeal. The trial court must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces.

We also held that "[a] circuit court's interpretation of a mandate of this Court and whether the circuit court complied with such mandate are questions of law that are reviewed *de novo*." *Id.*, at syl. pt. 4, 214 W.Va. 802, 591 S.E.2d 728.

In *Helfer I*, we limited the issue on remand to that of ascertaining the value, if any, of enterprise goodwill. However, we did not dictate the manner in which the family court was to proceed in that regard. Neither the letter nor the spirit of that opinion required the family court to take additional evidence on the value, if any, of the enterprise goodwill of Appellee's business. Rather, the family court had the discretion to either determine the issue on the existing record or to conduct another evidentiary hearing. As previously discussed, the existing record amply supported the family court's conclusion that the business had a zero value for enterprise goodwill (particularly in light of the correction to the transcript involving Mr. Bodkin's testimony in that regard). Thus, we find that the family court in no way abused its discretion in declining to take additional evidence on the issue of enterprise goodwill.

## IV. Conclusion

Based upon the foregoing, the June 26, 2008, order of the Circuit Court of Ohio County, is hereby affirmed.

Affirmed.