390 S.E.2d 826

**Richie Calvin TANKERSLEY**

v.

**Debra Rosemary TANKERSLEY.**

No. 18687.

Supreme Court of Appeals of West Virginia.

Decided March 9, 1990.

Concurring Opinion March 23, 1990.

---

F. Alfred Sines, Jr., Anderson & Sines, Winifred L. Bucy, Beckley, for Richie Calvin Tankersley.

H.L. Kirkpatrick, III, Ashworth & Kirkpatrick, Beckley, for Debra Rosemay Tankersley.

MILLER, Justice:

This is an appeal by Richie Calvin Tankersley, the plaintiff below, from a final divorce decree entered in the Circuit Court of Wyoming County. The defendant below is Debra Rosemary Tankersley. The central issue in this case is how to determine the value of a marital asset, a funeral home operated by a closely held corporation owned by Mr. Tankersley.

Mr. Tankersley contends that the trial court erred in deducting only one debt from the $325,000 market value of the business.

This debt was for $170,000, which was the amount owed to the former owner of the funeral home. Mr. Tankersley argues that W.Va.Code, 48–2–32(d)(1) (1984), requires the court to determine the "net value"[1] of the marital property; thus, the court should have deducted all the debts of the corporation from its fair market value.[2] Both parties acknowledge that the term "net value" is not defined within the statute. The question before us is to ascertain its meaning. The parties do not disagree that the funeral home is a marital asset. Moreover, there is no disagreement that the funeral home has a market value of $325,000.

While the accountants for both parties testified about the market value of the corporation,[3] neither testified about its net value. In particular, neither accountant was asked whether his estimate of the market value of the corporation assumed that the purchaser would be responsible for the existing debts or whether the debts would have to be discharged by the seller.

We have historically defined the market value of an asset as set forth in Syllabus Point 3 of *Estate of Aul v. Haden*, 154 W.Va. 484, 177 S.E.2d 142 (1970):

"The market value is the price at which a willing seller will sell and a willing buyer will buy any property, real or personal."[4]

*See also Franklin v. Pence*, 128 W.Va. 353, 36 S.E.2d 505 (1945); *Baltimore & Ohio R.R. Co. v. Bonafield's Heirs*, 79 W.Va. 287, 90 S.E. 868 (1916). For purposes of equitable distribution, W.Va.Code, 48–2–32(d)(1), requires that a determination be made of "the net value of all marital property of the parties[.]"

The concept of "net value" is rather simple when a court is valuing a single asset which has a valid lien or encumbrance. In these situations, the net value equals the fair market value of the property less the amount of any lien or encumbrance. We alluded to this equation in Syllabus Point 3, in part, of *LaRue v. LaRue*, 172 W.Va. 158, 304 S.E.2d 312, 41 A.L.R.4th 445 (1983): "In computing the value of any net asset, the indebtedness owed against such asset should ordinarily be deducted from its fair market value."[5] This is also the general rule elsewhere—in computing the net value of an asset, the first step is to establish its market value and then deduct the amount of any valid lien or encumbrance on the property. *E.g., Gravenstine v. Graven-*

1. The full text of W.Va.Code, 48–2–32(d)(1) (1984), is:

"After considering the factors set forth in subsection (c) of this section, the court shall:

"(1) *Determine the net value of all marital property* of the parties as of the date of the commencement of the action or as of such later date determined by the court to be more appropriate for attaining an equitable result[.]" (Emphasis added).

2. The December 31, 1986 balance sheet of the corporation indicated that the total assets of the business were $312,708.63 and the total liabilities, including the amount owed to the former owner, were $254,205.92. Assets of the business include cash, accounts receivable, inventory, property, and equipment. Current liabilities of the business include automobile loans, accounts payable, federal and state income taxes, sales tax, and social security tax.

3. The closely held funeral home corporation was acquired by Mr. Tankersley on January 1, 1985, for $325,000. Billy Arthur Black, the accountant for the corporation, testified on behalf of Mr. Tankersley. Mr. Black testified that if the corporation was sold at the time of the hearing, it would still have a fair market value of approximately $325,000.

Ross Dionne, a certified public accountant, testified on behalf of Mrs. Tankersley. He estimated that the market value of the corporation was between $310,477 and $380,300. Mr. Dionne's testimony was based upon data from the corporation's tax returns and financial statements. In arriving at his estimate, Mr. Dionne used a variety of valuation techniques: (1) adjusted net assets; (2) capitalization of earnings; (3) dividend-paying capacity; (4) excess earnings—return on net assets; (5) excess earnings—return on sales; (6) discounted cash flow; (7) discounted future earnings; (8) combination method; and (9) industry association method.

4. In *Estate of Aul*, 154 W.Va. at 489, 177 S.E.2d at 145, this Court used the phrase "when neither is under compulsion." When both the buyer and the seller are willing parties to the transaction, the parties are not acting under compulsion.

5. *LaRue* was decided before our legislature enacted the equitable distribution statute. *See generally* W.Va.Code, 48–2–32.

*stine,* 58 Md.App. 158, 472 A.2d 1001 (1984); *Balogh v. Balogh,* 356 N.W.2d 307 (Minn.App.1984); *Creon v. Creon,* 195 Mont. 254, 635 P.2d 1308 (1981); *Rider v. Rider,* 141 A.D.2d 1004, 531 N.Y.S.2d 44 (1988); *Alexander v. Alexander,* 68 N.C.App. 548, 315 S.E.2d 772 (1984); *Centazzo v. Centazzo,* 509 A.2d 995 (R.I.1986), *modified on other grounds,* 556 A.2d 560 (R.I.1989); *Trivett v. Trivett,* 7 Va.App. 148, 371 S.E.2d 560 (1988).

However, valuing assets becomes more difficult when the asset is part of a more complex entity, such as an on-going business. Most courts also recognize that the valuation problems are more acute in closely held corporations, whose stock is not publicly traded. Courts have cautioned against inflexibility and have incorporated some or all of the factors utilized by the Internal Revenue Service in Revenue Ruling 59–60.[6] *See In Re Marriage of Suarez,* 148 Ill.App.3d 849, 102 Ill.Dec. 85, 499 N.E.2d 642 (1986); *In Re Marriage of Rossi,* 113 Ill.App.3d 55, 68 Ill.Dec. 801, 446 N.E.2d 1198 (1983); *In Re Marriage of Moffatt,* 279 N.W.2d 15 (Iowa 1979); *Kowalesky v. Kowalesky,* 148 Mich.App. 151, 384 N.W.2d 112 (1986); *Bowen v. Bowen,* 96 N.J. 36, 473 A.2d 73, 56 A.L.R.4th 847 (1984); *Amodio v. Amodio,* 70 N.Y.2d 5, 516 N.Y.S.2d 923, 509 N.E.2d 936 (1987); *Matter of Marriage of Webber,* 99 Or.App. 703, 784 P.2d 111 (1989); *Wallace v. Wallace,* 733 S.W.2d 102 (Tenn.App.1987); *Bosserman v. Bosserman,* 9 Va.App. 1, 384 S.E.2d 104 (1989). *See generally* L. Golden, *Equitable Distribution of Property* § 7.08 (1983); 24 Am.Jur.2d *Divorce & Separation* § 947 (1983).

Admittedly, the foregoing cases were not concerned with an equitable distribution statute which uses the term "net value." We have found the phrase "net value" in the North Carolina equitable distribution statute, N.C.Gen.Stat. §50–20(c) (1987). As in our statute, the term is not defined therein.[7] However, the North Carolina courts do not appear to have applied the statutory term "net value" to valuing the worth of a closely held corporation or business.

In *Patton v. Patton,* 78 N.C.App. 247, 255, 337 S.E.2d 607, 612 (1985), *rev'd on other grounds,* 318 N.C. 404, 348 S.E.2d 593 (1986), the court approved of a method of valuing a closely held corporation which considered "the capitalization of earnings of the company, ... [its] earning capacity ... as demonstrated in the last four-to-five year period of time, the present economic outlook for the business and the industry, the good will which has been accumulated to the business ..., and [its] financial position ... as demonstrated by its unaudited statements[.]" This methodology had been previously sanctioned by the North Carolina Court of Appeals in *Phillips v. Phillips,* 73 N.C.App. 68, 326 S.E.2d 57 (1985). Moreover, the court in *Patton* approved of several examples of evidence useful in valuing closely held corporations, which were identified in *Phillips.* These included: "gross sales, cost of goods sold, profit, operating expenses, income, retained earnings." 78 N.C.App. at 256, 337 S.E.2d at 612. *See also Hartman v. Hartman,* 82 N.C.App. 167, 346 S.E.2d 196 (1986), *aff'd,* 319 N.C. 396, 354 S.E.2d 239 (1987).

---

**6.** Revenue Ruling 59–60, 1959–1 C.B. 237, 238, sets forth eight factors which should be analyzed in valuing the stock of a closely held corporation for federal gift and estate taxes:

"(a) The nature of the business and the history of the enterprise from its inception.

"(b) The economic outlook in general and the condition and outlook of the specific industry in particular.

"(c) The book value of the stock and the financial condition of the business.

"(d) The earning capacity of the company.

"(e) The dividend-paying capacity.

"(f) Whether or not the enterprise has goodwill or other intangible value.

"(g) Sales of the stock and the size of the block of stock to be valued.

"(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter."

**7.** In *Alexander v. Alexander,* 68 N.C.App. 548, 550–51, 315 S.E.2d 772, 775 (1984), the court, when valuing a family home with a mortgage, stated: "We give the term 'net value' its ordinary and commonly understood interpretation: i.e., market value, if any, less the amount of any encumbrance serving to offset or reduce market value."

Indeed, in *Draughon v. Draughon*, 82 N.C.App. 738, 347 S.E.2d 871 (1986), *review denied*, 319 N.C. 103, 353 S.E.2d 107 (1987), the court rejected the trial court's approach of valuing the business solely based on the net value of the tangible assets. Instead the *Draughon* court favored the capitalization of earnings method, which included considering a factor for good will.[8] A review of these cases suggests that the North Carolina courts employ the same technique generally used by other jurisdictions in evaluating a closely held corporation.

The fair market value of a closely held corporation or other business is not necessarily equivalent to its "net value" under W.Va.Code, 48–2–32(d)(1). Under this provision, the net value of a closely held corporation or business equals the net amount realized by the owner should the corporation or business be sold for its fair market value. The pertinent inquiry that must be made is whether the owner-seller will be responsible for the debts of the corporation or business, assuming a sale for its market value.

Commonly, the purchase of a closely held corporation occurs in one of two ways. Where the purchaser acquires the stock of the corporation, he ordinarily acquires all of the corporation's assets and liabilities.[9] In this situation, the amount paid to the owner-seller for his stock ordinarily represents the net value of the business because the owner-seller is not obligated to pay off the corporate debts.

The second method of purchasing a corporation or business is where the buyer acquires its assets. Under this arrangement, the market value does not equal the net value because the owner-seller will ordinarily be responsible for some or all of the business's debts or liabilities.[10] Again, the pertinent inquiry is what is the net sum that will be realized by the owner of the business if it is sold for its fair market value. Unfortunately, the valuation experts did not make this analysis in this case.

■ The trial court found that the fair market value of $325,000 assumed that Mr. Tankersley would be obligated to pay the $170,000 debt to the former owner. However, there was no testimony on this point, nor was there any evidence as to whether the other debts of the funeral business would be Mr. Tankersley's obligations if the business were sold at market value. Thus, we remand this case so the trial court can establish the net amount Mr. Tankersley would be expected to receive on a sale of the funeral business.

We, therefore, reverse the trial court's judgment and remand this case for reconsideration in light of the principles expressed herein.

Reversed and remanded.

McHUGH, Justice, concurring:

The majority opinion, with respect to the issue in this case, may have the effect of removing the "equitable" from our equitable distribution statute. Consequently, I concur only with the majority's ultimate judgment that this case be reversed and remanded.

Unfortunately, the majority opinion will not assist the trial court in applying appro-

---

8. The court's summary of the valuation of the business in *Draughon*, 82 N.C.App. at 741, 347 S.E.2d at 873, was:

"In the present case, defendant's evidence tends to show that plaintiff's business had goodwill and that the value of the business, including its goodwill, was $61,500.00. This valuation was prepared by an accounting firm using a capitalization of earnings method. Plaintiff's evidence as to the value of his business consisted of his testimony regarding the history of the business and the condition and value of the tangible assets at the date of separation. From this evidence the trial court concluded that the net value of the business

equaled the net value of the business's tangible assets. However, we are unable to determine from the court's findings what method it used in determining that the business had no goodwill and whether their determination was based on a sound method of valuation. We must remand this cause for further findings as to the value of plaintiff's business."

9. 1 J. Herez & C. Baller, *Business Acquisitions* § 5.201(b) (2d ed. 1981).

10. 1 J. Herez & C. Baller, *supra* note 9, § 5.202(b).

priate principles in equitable distribution proceedings. It leaves the trial court to speculate on what factors should be considered in determining net value. Although beginning with the correct premise and hinting at the correct conclusion, the majority opinion shies away from providing any practical guidance which trial courts must have. This can be a troublesome area of the law, and this Court should be more explicit in providing direction for the trial court in this respect.

This case presents this Court with an opportunity to provide guidance to trial courts throughout the state on how to arrive at net value for equitable distribution purposes, a task that the legislature did not take on in the enactment of *W.Va.Code*, 48–2–32(d)(1) [1984].

The first sentence of syllabus point 3 of the majority opinion states: "The fair market value of a closely held corporation or other business is not *necessarily* equivalent to its 'net value' under W.Va.Code, 48–2–32(d)(1) (1984)." (emphasis supplied) Therefore, the majority opinion apparently recognizes that the debts of a business may reduce the market value of the business, and thus, will cause market value to not equal net value. However, in very uncertain terms, syllabus point 3 falls short of stating *why* there may be a variance between market value and net value. This syllabus point merely suggests the obvious, that net value relates to the debts of the corporation, but the syllabus point fails to articulate what should be done with such debts. This cursory treatment will lead to confusion on the part of the trial court in adjudicating equitable distribution matters.

As stated in the majority opinion, the general rule in valuing *any* asset is set forth within syllabus point 3 of *LaRue v. LaRue*, 172 W.Va. 158, 304 S.E.2d 312 (1983): "In computing the value of any net asset, the *indebtedness* owed against such asset *should ordinarily be deducted* from its fair market value." (emphasis supplied) This fundamental principle, however, is ultimately disregarded by the majority with respect to the facts of this case, involving the valuation of a closely held corporation.

Rather, the majority opinion provides little to no guidance as to how a trial court is to determine net value for purposes of *W.Va. Code*, 48–2–32(d)(1) [1984].

North Carolina's equitable distribution statute, as noted in the majority opinion, uses the term "net value," and, like our statute, fails to define its use. Relegated to a footnote in the majority opinion is the decision of a North Carolina court which has addressed the issue of the meaning of "net value" as it is used in that state's statute. "[W]e give the term 'net value' its ordinary and commonly understood interpretation: i.e., market value, if any, less the amount of any encumbrance serving to offset or reduce market value." *Alexander v. Alexander*, 68 N.C.App. 548, 550–51, 315 S.E.2d 772, 775 (1984).

The majority opinion points out that this definition, by the North Carolina court, was applied in the context of a marital residence, thus apparently attempting to support its earlier assertion that "valuing assets becomes more difficult when the asset is part of a more complex entity, such as an on-going business." This bald assertion does not persuade. Rather, it obscures the intended result. There is no support for the majority's implication that the arrival at net value should be accomplished by means other than that which would be utilized for a marital residence. In this respect, the majority's assertion is pure *ipse dixit*. While it may be true that the valuation of a business is more complex for an accountant in determining market value, our concern lies with the statutory requirement of determining net value for equitable distribution purposes.

The Wisconsin Supreme Court, in *Wahl v. Wahl*, 39 Wis.2d 510, 159 N.W.2d 651 (1968), approved the trial court's consideration "that the stock of the [closely held] corporation was worth as much as its assets, *less its liabilities.*" *Id.* at 514, 159 N.W.2d at 653 (emphasis supplied). There, the trial court utilized Revenue Ruling 59–60, 1959–1 C.B. 237, before deducting liabilities to arrive at net asset value.

The majority opinion in this case does acknowledge that Revenue Ruling 59–60 is

one way of valuing a closely held corporation. Revenue Ruling 59–60 sets forth eight factors to be analyzed:

(a) The nature of the business and the history of the enterprise from its inception.

(b) The economic outlook in general and the condition and outlook of the specific industry in particular.

(c) The book value of the stock and the financial condition of the business.

(d) The earning capacity of the company.

(e) The dividend-paying capacity.

(f) Whether or not the enterprise has goodwill or other intangible value.

(g) Sales of the stock and the size of the block of stock to be valued.

(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

The factors considered under Revenue Ruling 59–60 are supported by several authorities. *See, e.g., In re Marriage of Moffatt*, 279 N.W.2d 15, 19 (Iowa 1979); *Nardini v. Nardini*, 414 N.W.2d 184, 190 (Minn.1987); *Bowen v. Bowen*, 96 N.J. 36, 51, 473 A.2d 73, 80–81 (1984); *Wallace v. Wallace*, 733 S.W.2d 102, 107–08 (Tenn.Ct. App.1987), *permission to appeal denied* (Tenn. June 22, 1987); L. Golden, *Equitable Distribution of Property* § 7.08 (1983); Perocci & Walsh, *Putting a Value on: Closely Held Corporations*, Fam.Advoc., Summer 1979, at 32; *Close Corporations: Valuation Issues*, Equitable Distribution J., Feb. 1986, at 13.

Undoubtedly, there are many approaches to valuing a business. These approaches, in turn, lead to differing *market* values. They are independent of *net* value. As indicated by the precedents cited in the majority opinion, accountants and valuation experts normally do have various opinions as to how to arrive at *market* value.

The issue in this case is whether liabilities should be deducted from the market value to arrive at net value of a closely held corporation for equitable distribution purposes. *LaRue, Alexander* and *Wahl* provide guidance on this point. The cases cited in the majority opinion do not address this issue. They deal with the various approaches to calculating market value, not net value. The treatise on business acquisitions discussed in the majority opinion is also inapposite. For equitable distribution purposes, there is no need to assume a sale between the spouses. The only question is: "net value" is market value "net" of what? The majority opinion does not clearly answer this question. Its discussion only obfuscates, especially the second sentence of syllabus point 3, which apparently equates market value and net value.

The majority opinion looks to the analogy of business acquisitions and the negotiable responsibility for debts between the buyer and seller. In the context of equitable distribution, however, the distribution is only of the net worth or "equity," with a sharing of both asset valuations and liability amounts. On a related point, the reference near the end of the majority opinion to the lack of evidence on the appellant's obligation to pay the mortgage and other liabilities is curious. In the first place, the appellee did not cross-assign as error the deduction of the mortgage payable. In the second place, the *corporation* is responsible for those liabilities; if there is any personal liability therefor, both spouses should share the liabilities for "net value" purposes, as both spouses, for those purposes, share the market value of the assets.

The determination of "net value" of a closely held corporation or of any other marital asset for equitable distribution purposes is somewhat comparable to the distribution of net proceeds at the "closing" of a sale of realty. Initially an appraisal will be performed to determine the market value of the realty. At that point there are various techniques to arrive at market value, and the amount of any outstanding debt on the realty owed by the seller is not considered, as it is irrelevant to the market value of the property. However, in distributing the net proceeds of the sale at the closing, the amount of any outstanding debt on the property owed by the seller is deducted from the market value of the

realty to arrive at the net proceeds due to the seller. In short, the seller receives the monetary equivalent of his or her equity in the realty.

Due to its failure to provide guidance for trial courts in determining net value, the majority opinion may allow accountants and valuation experts to express differing opinions on not only market value but also on net value, a term that is foreign to them and not defined for them.

In summary, the majority opinion is problematic in several ways: (1) it provides little to no guidance for a trial court to determine net value of a closely held corporation for equitable distribution purposes; (2) it will very likely saddle one party with the payment of debts incurred in the operation of the business, while the other party enjoys the benefit of half of the corporation's value *before* a substantial amount of liabilities are even considered; and (3) it may allow accountants and valuation experts to express differing opinions on how to arrive at a net value figure, which, under *LaRue, Alexander* and *Wahl* is a straight-forward calculation once market value is determined.

Based upon the foregoing, I concur only with the majority's ultimate judgment that this case be reversed and remanded.

I am authorized to state that Chief Justice NEELY joins me in this concurring opinion.